1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7
8
9
10
11
12
13
14
15
16

SHAWNA K CUROW-RAY,
CHRISTOPHER D. RAY, and DONNA M.
RAY,

         Plaintiffs,

     v.

CITY OF TUMWATER, a code city,
municipality, OFFICER J. WEIKS, TPD,
AND "JANE DOE" WEIKS, husband and
wife and the marital community thereof,
OFFICER C. QUILES, TPD, "JANE DOE"
QUILES, and the marital community thereof,

         Defendants.

CASE NO. C09-5633RJB

**ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

17
18
19

     This matter comes before the Court on the Defendants' Motion for Summary Judgment
(originally Dkt. 10, redacted and re-docketed as Dkt. 22). The Court has considered the motion,
opposition to the motion, if any, and the file herein.

20

         **I.     FACTS AND PROCEDURAL HISTORY**

21
22
23
24

     Originally filed in Thurston County, Washington Superior Court, Plaintiffs bring this
case pursuant to federal law alleging that their rights were violated when their children and
grandchildren were placed in protective custody. Dkt. 1. Plaintiffs also make state law claims.
*Id.*

25

     **A.    FACTS**

26
27

     Many of these facts appear in the case *Ray v. City of Lacey*, Western District of
Washington case number 09-5636RJB, but are repeated here with citations to the record in this

28

1   case.  Some of the events related below are relevant to this case alone.

2       Plaintiffs Christopher Ray and his wife, Shawna Curow-Ray married in April of 2007.

3   Dkt. 26, at 5.  According to Ms. Curow-Ray, in February or March of 2007, they began to use

4   methamphetamine ("meth").  Dkt. 26, at 6.  At first they used meth every two weeks, but by June

5   of 2007, it got to be an $80.00 a day habit.  Dkt. 26, at 6.  The couple had a son together, T.R.

6   (age 6 at the time of these events), and Ms. Curow-Ray had a daughter from a previous

7   relationship, T.C. (age 11).  Dkt. 26, at 5.  Ms. Curow-Ray testified that, "I know that I wasn't

8   the best mother during that period.  I know that their needs got set aside for my addiction.  I

9   don't think I'll ever fully know what I have completely done to my kids."  Dkt. 26, at 6.  She

10  testified that due to their drug habit and "lifestyle" the children were left alone, and put

11  themselves to bed at night.  Dkt. 26, at 7.  Ms. Curow-Ray testified that by June of 2007, she and

12  Mr. Ray were having verbal arguments over money.  Dkt. 26, at 7.

13      Ms. Curow-Ray testified that her memory at the time was "real fuzzy."  Dkt. 26, at 6.

14  She testified that on Friday, June 15, 2007, she and Mr. Ray were at a friend's house.  Dkt. 26, at

15  7.  Ms. Curow-Ray testified that she would go on "two-or three- day binges" using meth, and

16  this was the second day of the binge.  Dkt. 26, at 8.  Mr. Ray states that he did not use drugs that

17  night.  Dkt. 20, at 1.  Mr. Ray left Ms. Curow-Ray at the friend's house, without a way to get

18  home.  Dkt. 26, at 7.  Ms. Curow-Ray testified that she called a friend to come and get her, and

19  when she got home, (around 1:30 a.m. on the 16th), a big argument began between she and Mr.

20  Ray.  Dkt. 26, at 8.

21      Ms. Curow-Ray testified that she left the house for several hours, and returned in the

22  morning.  Dkt. 26, at 8.  She states that when she returned home, there was a man in the garage

23  with Mr. Ray that she did not like.  Dkt. 26, at 8.  She stated that the man sometimes supplied

24  them with drugs.  Dkt. 26, at 8.  She stated that when she saw that man, she thought there was

25  going to be more drugs at their house.  Dkt. 26, at 9.  She testified that she wanted to get clean

26  and not continue down the path that they were on.  Dkt. 26, at 9.  She states that when she saw

27  that man in the garage with her husband, she got angry.  Dkt. 26, at 9.  Ms. Curow-Ray testified

28

1   that she then went into the garage, began to yell at Mr. Ray and "got real aggressive" with him.

2   Dkt. 26, at 8.  Ms. Curow-Ray testified that: "I remember yelling at him.  I walked up to him,

3   pushed him, and then I swung and punched him in his eye.  I continued to grab at him.  I was

4   trying to knock him down." Dkt. 26, at 9.  She states that after she punched him in the eye, he

5   shoved her and she fell back a couple of steps.  Dkt. 26, at 9.  She states that she tripped on the

6   "step into the house and hit the doorjamb." Dkt. 26, at 9.  Ms. Curow-Ray testified that as a

7   result of hitting the doorjamb, she suffered an elevated collar bone and a "pretty good bruise" on

8   her left thigh.  Dkt. 26, at 11.

9        In any event, they then entered the house, and Ms. Curow-Ray states that she went into a

10  bedroom with her daughter to calm down and tried to watch a movie.  Dkt. 26, at 9-10.  She

11  testified that Mr. Ray eventually came into the bedroom to retrieve the VCR or TV that they

12  were using, and they began to yell at each other again.  Dkt. 26, at 9-10.  Ms. Curow-Ray states

13  that although her memory is "real fuzzy" at this point, she thinks that they came out of the

14  bedroom yelling at each other.  Dkt. 26, at 10.  Ms. Curow-Ray testified that she didn't know

15  how, but he ended up on top of her on the couch.  Dkt. 26, at 10.  Ms. Curow-Ray states that

16  while they were on the couch,  her daughter jumped on Mr. Ray's back and yelled, "get off my

17  mom!" Dkt. 26, at 10.  Ms. Curow-Ray testified that she remembered Mr. Ray grabbing her

18  daughter and feeling scared.  Dkt. 26, at 10.  She testified that she thought "Oh gosh, now he's

19  going to hurt her.  But he let her go." Dkt. 26, at 10.

20        T.C., the eleven year old daughter, testified that about a half an hour after the couch

21  incident, there was another conflict between her parents.  Dkt. 26, at 39.  She testified that she

22  didn't know who pushed first, but that her mother "like was hit against the door or was pushed.

23  She tripped into the doorjamb thing."   Dkt. 26, at 39.  She states that her mother hit her

24  shoulder.  Dkt. 26, at 39.

25        Ms. Curow-Ray testified that after the couch incident, Mr. Ray's mother, Donna Ray,

26  showed up.  Dkt. 26, at 10.  Ms. Curow-Ray states Mr. Ray and she continued to argue as Mr.

27  Ray was loading his car up with stuff.  Dkt. 26, at 10.  She states that she came at him again and

28

ORDER
Page 3

1    he pushed her again to get her "out of his face." Dkt. 26, at 10.  At this point, Ms. Curow-Ray

2    called the police.  Dkt. 26, at 10.  City of Lacey police officers responded to the call and arrested

3    Mr. Ray as the primary aggressor in a domestic violence assault.  The Lacey police officers are

4    not defendants in his action, but are defendants in a separate action filed by Mr. Ray.  *Curow-*

5    *Ray v. City of Tumwater,* Western District of Washington case number 09-05636 RJB.

6            T.C. (age 11), testified that she spoke with the Lacey police officers.  Dkt. 26, at 40.  She

7    stated that she told them that she saw her parents yelling at each other and that they got into a

8    physical fight.  Dkt. 26, at 40.  T.C. testified that she told them that she pulled her dad off of her

9    mom.  Dkt. 26, at 40.  T.C. stated that she told the officers that her mom injured her shoulder

10   when she made contact with the doorjamb during the fight with her dad.  Dkt. 26, at 40.

11           Ms. Curow-Ray testified after the Lacey police officers left with Mr. Ray, her father, Cal

12   Curow, who owned the house they were living in, told her he was evicting them.  Dkt. 26, at 12.

13   Ms. Curow-Ray states that they discussed either Cal Curow or her brother, Dean Curow, taking

14   her daughter, T.C., for the summer.  Dkt. 26, at 12.  Ms. Curow-Ray testified that she was "fine"

15   with her daughter going to her brother's for the summer.  Dkt. 26, at 12.  Ms. Curow-Ray

16   testified that she asked Mr. Ray's mother, Donna Ray, to keep her son T.R. but not necessarily

17   for the whole summer.  Dkt. 26, at 13.

18           Ms. Curow-Ray states that at Donna Ray's urging she went to the hospital on Sunday,

19   June 17, 2007, regarding her shoulder.  Dkt. 26, at 13.  She states that she had an x-ray done, had

20   to wear a sling, and completed follow up visits because "they weren't sure" if she needed

21   surgery.  Dkt. 26, at 11.

22           Ms. Curow-Ray testified that on Monday, the 18th of June, she went to a Department

23   Social and Health Services ("DSHS") office.  Dkt. 26, at 13.  The record does not state which

24   DSHS office.  She states that she completed a mini drug evaluation and was being evaluated for

25   domestic violence counseling.  Dkt. 26, at 13.  Ms. Curow-Ray testified that she left that DSHS

26   office, called her brother, Dean, and told him that she wanted T.C. back.  Dkt. 26, at 13.  He told

27   her "no."  Dkt. 26, at 13.  She states that around noon she then called her dad and told him her

28

1    brother would not return T.C.  Dkt. 26, at 13.  She relates that her dad told her that he and Dean

2    were filing for temporary custody of T.C. at the Tumwater, Washington, DSHS office.  Dkt. 26,

3    at 13.  Ms. Curow-Ray states that she called the police from Donna Ray's house and drove to the

4    Tumwater DSHS office, around 15-20 minutes away.  Dkt. 26, at 13-14.

5         Tumwater Officer Jon Weiks states that on June 18, 2007, he was dispatched to the

6    Tumwater DSHS office in response to a custodial interference call.  Dkt. 25, at 1.  He states that

7    he spoke with Dean Curow and his wife.  Dkt. 25, at 2.  Officer Weiks states that they told him

8    that they had been contacted by Cal Curow to assist with his sister's daughter as his sister had

9    been involved in a domestic violence incident, was high on meth, did not have a job, and was

10   about to be evicted.  Dkt. 25, at 2.  Officer Weiks states that he spoke with T.C. who stated that

11   she had witnessed the domestic violence incident, it was becoming more and more common, and

12   she was left alone several days a week from 8:00 p.m. to 10:00 p.m.  Dkt. 25, at 2.  Officer

13   Weiks stated that T.C. told him that she would occasionally go to bed without either parent there.

14   Dkt. 25, at 2.

15        Ms. Curow-Ray states that two City Tumwater police officers met her outside the

16   Tumwater DSHS office.  Dkt. 26, at 13.  Officer Quiles states that he waited outside for Ms.

17   Curow-Ray to arrive and stood by while Ms. Curow-Ray spoke with Officer Weiks.  Dkt. 12, at

18   2.  He states that he did not conduct any of the investigation.  Dkt. 12, at 2.  Ms. Curow-Ray

19   states that a Tumwater officer asked her how long she'd been clean, and she told him three days.

20   Dkt. 26, at 13.  Ms. Curow-Ray states that she "explained the situation, what happened,

21   explained to them what [she] had been doing and what [she] was trying to do with the treatment

22   and stuff."  Dkt. 26, at 13.  Officer Weiks states that Ms. Curow-Ray had on a sling as a result of

23   an injury she attributed to the domestic violence incident.  Dkt. 25, at 3.  Ms. Curow-Ray states

24   that it "got a little ugly outside because they found out [she] was a drug addict."  Dkt. 26, at 13.

25   Ms. Curow-Ray acknowledges that she told them that she was a meth addict, there had been a

26   domestic violence incident two days ago, and her husband was still in custody for that event.

27   Dkt. 26, at 14.  Ms. Curow-Ray further told the Tumwater police officers that she had not

28

ORDER
Page 5

entered treatment, was trying to enter treatment, and was "teetering" on the edge of using meth again that day. Dkt. 26, at 15. Officer Weiks states that she also disclosed that she had a history of drug use which resulted in losing custody of T.C. for nearly 2 and ½ years. Dkt. 25, at 3.

Ms. Curow-Ray testified that the officers told her that she "had to go upstairs [into the DSHS office] and talk to one of the workers." Dkt. 26, at 15. She testified that she "willingly" went. Dkt. 26, at 15.

Ms. Curow-Ray testified that she and the Tumwater officers went into a DSHS office with a long table. Dkt. 26, at 14. She testified that a DSHS worker, Rebecca Neal, came in and explained what was "going on" and "that her kids were being placed into protective custody." Dkt. 26, at 15. Ms. Curow-Ray states that they kept asking her about T.R.'s location. Dkt. 26, at 15. Ms. Curow-Ray says that "she fought it" for about 40 minutes, but then was told that she would be charged with endangering a minor if she did not produce T.R. Dkt. 26, at 15. She testified that she felt "backed into a corner . . . it was either throw [her] kids into foster care or send [her] kids with [her] brother." Dkt. 26, at 16. (She acknowledges that her brother and his wife were a good parents. Dkt. 26, at 16.) Ms. Curow-Ray testified that she felt that it was Ms. Neal who was not giving her a choice. Dkt. 26, at 20. Ms. Curow-Ray states that she knew that she was being accused of neglecting her kids based upon her daughter's statements about being left alone. Dkt. 26, at 16.

Ms. Curow-Ray states that she called Donna Ray and asked her to bring T.R. to her at the DSHS office, and Donna refused. Dkt. 26, at 18. Tumwater Officer Weiks called Donna Ray and told her that if she did not bring T.R. to them, she would be charged with a crime. Dkt. 26, at 18, and 47. Donna Ray refused. Dkt. 26, at 48. Donna Ray states that she told Officer Weiks that T.R. would be safe with her and that his parents had asked to keep him while they got their lives "back on track." Dkt. 16, at 1. Ms. Curow-Ray testified that she then called Donna Ray back and told her that she had to bring T.R. to her at the DSHS office. Dkt. 26, at 18. Donna Ray agreed at that point, and brought T.R. to the Tumwater DSHS office. Dkt. 26, at 18. Donna Ray states that she "felt she had no choice in the matter, and that [she] had no freedom to remain

at home with T.R. because of Officer Weiks' threat to arrest [her] and take T.R. from [her] by force." Dkt. 16, at 2.    Donna Ray testified that she tried to calm T.R. on the way to the DSHS office. Dkt. 26, at 48.    She testified that once they arrived all the people at the DSHS office were rude. Dkt. 26, at 48.    She testified that one of the Tumwater police officers "like snatched" T.R. from her and told her that he was taking T.R. to his sister. Dkt. 26, at 48.    Donna Ray states that the officer refused to let her talk with Ms. Curow-Ray. Dkt. 16, at 2.    Donna Ray stated that she was never held against her will by a Tumwater police officer. Dkt. 26, at 51.

Officer Weiks states that he confirmed the domestic violence incident with the Lacey police department. Dkt. 25, at 3.    He states that as a result of all the circumstances, he decided to place both children in protective custody and immediately turned the children over to DSHS. Dkt. 25, at 3.

Ms. Curow-Ray signed Voluntary Placement Agreements placing both T.C. and T.R. with her brother Dean Curow from June 18, 2007, to July 30, 2007. Dkt. 26, at 17.    Mr. Ray also signed the Voluntary Placement Agreements. Dkt. 26, at 34.    The Voluntary Placement Agreements were not extended beyond July 30, 2007. Dkt. 26, at 17.    Ms. Curow-Ray testified that the Tumwater police officers were in the room during her conversation with Ms. Neal regarding the Voluntary Placement Agreements, but she "kept telling them to shut up and quit talking." Dkt. 26, at 20.    Although she states that she was in a locked room, she did not ask to leave prior to signing the Voluntary Placement Agreements, and stated that she was "not leaving that office without her kids." Dkt. 26, at 20.

Mr. Ray was arraigned in Thurston County Washington, District Court in the afternoon of July 18, 2007. Dkt. 26, at 24.    Upon reviewing the statement of probable cause, the court initially found that there was probable cause for Mr. Ray's arrest. Dkt. 26, at 26.    After hearing that the prosecutor was unsure whether charges would also be filed against Ms. Curow-Ray, the following exchange took place:

> The Court:  Well, I will tell you this, I mean, maybe I should just not find probable cause until you decide what you are going to do then . . . Because it's unequal justice, in my opinion.  I'm just not going to find probable cause at this point in time.

1   Prosecutor: Well, okay.
    The Court: So you get to decide . . .
2   Prosecutor: Well - -
    The Court: I'm not - - I'm sick and tired of  - - -
3   Prosecutor: I understand the issue, with all due respect.  But I'm not - -
    The Court: Well, then both parties need to be charged or neither party needs to be
4   charged.
    Prosecutor: Well. . .
5   The Court: So right now I'm going to not find probable cause and you are
    released on PR.  If you go back there, Mr. Ray, you're probably going to be ended
6   up with not only this case, which I will allow the city to refile because I'm
    dismissing it without prejudice at this point, but you are going to have another
7   charge as well.. .

8   Dkt. 26, at 28-29.

9       After Mr. Ray was arraigned, Donna Ray returned to the couples' home to retrieve a cell

10  phone.  Dkt. 26, at 19.  Ms. Curow-Ray testified that Donna Ray was upset over T.R. being

11  taken.  Dkt. 26, at 19.  Ms. Curow-Ray stated that she didn't want to fight with Donna Ray and

12  so walked away and "a bottle of perfume in a box got broke."  Dkt. 13, at 19.  Ms. Curow-Ray

13  states that she then called the police "just to have them return the cell phone to her and that's

14  when she ended up getting arrested for domestic violence."  Dkt. 13, at 19.  After Donna Ray's

15  arrest, there was a no contact order in place between Donna Ray and Ms. Curow-Ray for a year

16  and a half.  Dkt. 26, at 19.  Donna Ray states that she did not have contact with Ms. Curow-Ray

17  until the order expired.  Dkt. 26, at 50.  Donna Ray acknowledges that she did not contact Ms.

18  Curow-Ray to see the children during that time.  Dkt. 26, at 50.  Donna Ray acknowledges that

19  she has never had legal custody of either of the children, nor has she been their legal guardian.

20  Dkt. 26, at 51.

21      Ms. Curow-Ray testified that near the end of July 2007, the children were returned.  Dkt.

22  26, at 18.  Ms. Curow-Ray states that while her brother Dean Curow  had the children, he

23  allowed her to visit them.  Dkt. 26, at 18.  Mr. Ray testified that he could not remember how long

24  the children were gone, but that he only got to visit them three times.  Dkt. 26, at 34.

25      Mr. Ray testified that he could not recall any contact with any one from the Tumwater

26  Police Department.  Dkt. 26, at 35.  He states that when he was released from jail, he was

27  "shocked" to discover that the children had been taken from his wife's custody.  Dkt. 17, at 1.

28

He asserts that they were "not perfect parents, but [they] always took care of the children, making sure that they were safe and secure." Dkt. 17, at 1. Donna Ray states that she felt she was a competent grandmother, and T.R. should have been left with her rather then taken into protective custody. Dkt. 16, at 2. Ms. Curow-Ray states that she realized that she had a drug problem, but was making every effort to keep her children "shielded from it and safe." Dkt. 15, at 3.

**B.    PROCEDURAL HISTORY**

Plaintiffs' Complaint makes a federal claims for:  1) the violation of "the well established right of family unity" under the heading 42 U.S.C. § 1983, and 2) the Defendants' conspiracy to interfere with the Plaintiffs' civil rights under 42 U.S.C. § 1985 (1), (2), and (3).  Dkt. 1. Plaintiffs' Complaint makes state law claims for:  1) the false imprisonment of Ms. Curow-Ray and Donna Ray against the individual officers, 2) outrage, 3) negligent training/supervision against the City of Tumwater, 4) negligent hiring and retention against the City of Tumwater, and 5) interference with family relations. *Id.* Plaintiffs seek damages, attorneys' fees and costs. *Id.*    Plaintiff Christopher Ray filed an additional case, alleging that the City of Lacey and individually named Lacey police officers "deprived him of his fundamental right to his children's companionship," have violated his civil rights, and references 42 U.S.C. § 1983. *Ray v. City of Lacey, et.al.,* Western District of Washington case number 09-5636RJB, Dkt. 1-3, at 10.  In that case, Plaintiff Ray brings "claims against the Defendants . . . for their conspiracy to interfere with civil rights in obstructing justice to Plaintiff, and by intimidation or threat to the Plaintiff, and depriving the Plaintiff of rights and privileges pursuant to 42 U.S.C. § 1985 (1), (2), and (3)." *Ray v. City of Lacey, et.al.,* Western District of Washington case number 09-5636RJB, Dkt. 1-3, at 10-11.  Plaintiff alleges a claim of negligent hiring and retention against Defendant City of Lacey.  *Ray v. City of Lacey, et.al.,* Western District of Washington case number 09-5636RJB, Dkt. 1-3, at 10.  In that case, Plaintiff Ray also asserts state law claims for false imprisonment and arrest, negligent training and supervision, outrage, and interference with family relations. *Ray v. City of Lacey, et.al.,* Western District of Washington case number 09-

1    5636RJB, Dkt. 1-3, at 8-10.

2        **C.    PENDING MOTION**

3        On June 25, 2010, Defendants filed a Summary Judgment Motion, seeking dismissal of

4    all Plaintiff's claims.  Dkt. 22 (originally filed as Dkt. 10 refiled as Dkt. 22 in redacted form).

5    As to the federal claims, Defendants argue that:  1) they are entitled to qualified immunity as to

6    the claims brought pursuant to 42 U.S.C. § 1983, 2) there is no basis for liability under 42 U.S.C.

7    § 1985, and 3) there is no basis for municipal liability under *Monell v. N.Y. City of Dept. of Soc.*

8    *Services,* 436 U.S. 658, 694 (1978).  Dkts. 22 and 20.

9        Defendants argue that the state law claims should be dismissed because:  1) there is no

10   evidence that the named Defendants arrested or imprisoned any of the Plaintiffs, 2) there is no

11   evidence to support a claim for outrage, 3) Plaintiffs' claims against the City of Tumwater for

12   negligent training and supervision are precluded by the public duty doctrine, 4) there is no

13   evidence to support a claim for negligent training or supervision, and 5) the evidence does not

14   support a claim for interference with family relations.  Dkts. 22 and 20.

15       Plaintiffs respond, and argue that:  1) the individual Defendant officers violated their

16   clearly established constitutional right to the care, custody, and control of their children and so

17   are not entitled to qualified immunity, 2) that Defendants are liable for conspiring to interfere

18   with the Plaintiffs' right to the care, custody and control of their children under 42 U.S.C. §

19   1985, and 3) they are not asserting a claim under 42 U.S.C. § 1983for municipal liability.  Dkt.

20   14.

21       As to the state law claims, Plaintiffs argue that the Defendant officers violated RCW

22   26.44.050 because there was not probable cause to believe the children were abused or

23   neglected, would be injured or could not be taken into custody if a court order had to be acquired

24   first.  Dkt. 14.  Plaintiffs further argue that: 1) the claim for false arrest as to Donna Ray and Ms.

25   Curow-Ray should not be dismissed, 2) there is evidence to support their claim for outrage, 3)

26   the public duty doctrine does not preclude a claim for negligent hiring, retention, training or

27   supervision, 4) there is sufficient evidence of negligent supervision because the officers took the

28

1   children contrary to the statute, and 5) there is evidence of interference with family relations.

2   Dkt. 14.

3                                    **II.   DISCUSSION**

4   **A.     SUMMARY JUDGMENT - STANDARD**

5           Summary judgment is proper only if the pleadings, depositions, answers to

6   interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

7   genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

8   law.  Fed. R. Civ. P. 56(c).  The moving party is entitled to judgment as a matter of law when the

9   nonmoving party fails to make a sufficient showing on an essential element of a claim in the case

10  on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

11  323 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could

12  not lead a rational trier of fact to find for the non moving party.  *Matsushita Elec. Indus. Co. v.*

13  *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific,

14  significant probative evidence, not simply "some metaphysical doubt.");  *See also* Fed. R. Civ. P.

15  56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence

16  supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions

17  of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v.*

18  *Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

19          The determination of the existence of a material fact is often a close question.  The court

20  must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

21  e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254; *T.W. Elec.*

22  *Serv., Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of

23  the nonmoving party only when the facts specifically attested by that party contradict facts

24  specifically attested by the moving party.  The nonmoving party may not merely state that it will

25  discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

26  to support the claim.  *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*.

27  Conclusory, non specific statements in affidavits are not sufficient, and missing facts will not be

28

ORDER
Page 11

presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**B.     FEDERAL CLAIMS AND QUALIFIED IMMUNITY**

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Through application of the qualified immunity doctrine, public servants avoid the general costs of subjecting officials to the costs of trial - distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service."  *V-1 Oil Co. v. Smith*, 114 F.3d 854, 857 (9th Cir. 1997)(*internal citations omitted*).   The immunity is "immunity from suit rather than a mere defense to liability."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

The Supreme Court established a two-part analysis in *Saucier v. Katz*, 533 U.S. 194, 201 (2001), for determining whether qualified immunity is appropriate in a suit against a public official for an alleged violation of a constitutional right.  *Boyd v. Benton County*, 374 F.3d 773, 778 (9th Cir. 2004), citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Although no longer mandatory, the Supreme Court has recently held that it may be "beneficial" for a court required to rule upon qualified immunity to examine the *Saucier* factors:  (1) whether the official violated the plaintiff's constitutional rights on the facts alleged and (2) if there was a violation, whether the constitutional rights were clearly established.  *Pearson v. Callahan*, 129 S.Ct. 808, (2009) (holding that the *Saucier* two-part analysis was no longer mandatory).

Application of the factors is beneficial here, so this opinion will first turn to whether Plaintiffs' substantive due process rights were violated, if so whether those rights were clearly established, and then whether there is some basis to hold the individual defendants liable under § 1985.

1.     *Substantive Due Process Right to Family Unity*

a.     *Violation?*

The Substantive Due Process Clause of the Fourteenth Amendment to the U.S.

Constitution protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children. *Troxel v. Grandville,* 530 U.S. 57, 64 (2000).

i.      Officer Quiles

Plaintiffs point to no evidence that Officer Quiles was in any manner involved in the decision to place the children into protective custody. Their substantive due process claim as to him should be dismissed.

ii.      Officer Weiks

Plaintiffs' claim for violation of their right to family unity in part depends on Plaintiffs' individual circumstances. Officer Weiks' decision to place the children into temporary protective custody will be examined regarding the rights and circumstances of each of the Plaintiffs.

As to Donna Ray, the Ninth Circuit has held that non-custodial grandparents do not have a constitutionally protected liberty interest in the care, custody and control of their grandchildren. *Miller v. California,* 355 F.3d 1172, 1175 (9th Cir. 2004). Donna Ray acknowledged that she was not the legal guardian and did not have legal custody of either of her grandchildren. She stated that T.R. often spent the night and she baby sat him. She, like the grandparents in *Miller* who cared for their grandchildren for a substantial period of time, often cared for T.R. but did not have custody of him. Donna Ray does not have a protected constitutional interest in family unity with her grandchildren, and accordingly, her constitutional claim should be dismissed. *Miller,* at 1176.

While a parent's constitutional liberty interest in the maintenance of the familial relationship exists, this right is not absolute. *Woodrum v. Woodward County,* 866 F.2d 1121, 1125 (9th Cir 1989). The interest of the parents must be balanced against the interests of the state in protecting the child. *Id*. The Fourteenth Amendment, then, "guarantees that parents will not be separated from their children without due process of law except in emergencies." *Mabe v. San Bernadino Co. Dept. of Public Social Services,* 237 F.3d 1101, 1107 (9th Cir. 2001). "Officials may remove a child from the custody of its parent without prior judicial authorization

1    only if the information they possess at the time of the seizure is such as provides reasonable

2    cause to believe that the child is in imminent danger of serious bodily injury and that the scope

3    of the intrusion is reasonably necessary to avert that specific injury." *Wallis v. Spencer,* 202

4    F.3d 1126, 1138 (9th Cir. 2000). Generally, these are jury questions, and summary judgment in

5    favor of the defendant is only proper where, viewing the evidence in a light most favorable to

6    plaintiff, it is clear that no reasonable jury could conclude that the plaintiff's constitutional rights

7    were violated. *Id.*

8       Mr. Ray's claim for violation of his substantive due process rights to family unity should

9    be dismissed. Mr. Ray was incarcerated for a domestic violence assault at the time the decision

10    to place the children in temporary protective custody was made. There is no evidence that Mr.

11    Ray did not voluntarily sign the forms giving temporary custody of the children to Dean Curow

12    and his wife. His claim should be dismissed.

13       Ms. Curow-Ray's claim for a violation of her substantive due process rights against

14    Officer Weiks for his decision to put the children into protective custody should also be

15    dismissed. Officer Weiks had ample information, at the time the decision was made, justifying

16    placement of the children in protective custody. That information provided reasonable cause to

17    believe that the children were in imminent danger of serious bodily injury and that the scope of

18    his intrusion was reasonably necessary to avert that specific injury. *Wallis,* at 1138.

19       First, Officer Weiks had probable cause to believe that the children were in "imminent

20    danger of serious bodily harm." *Wallis,* at 1138. Mr. Ray was in custody for assaulting Ms.

21    Curow-Ray at the time. Officer Weiks observed Ms. Curow-Ray wearing a sling, and she told

22    him that her injury was a result of the fight with Mr. Ray. Officer Weiks was aware that Mr. Ray

23    was in jail and it was unclear when he would be released from custody. Both children told

24    Officer Weiks that their parents had been fighting a lot lately. T.C. informed Officer Weiks that

25    she witnessed the physical fight between her parents which lead to Mr. Ray's arrest, and that

26    these incidents were becoming more and more frequent. T.C. was, in fact, involved in the

27    physical altercation with her parents, but it is unclear from the record whether Officer Weiks

28

ORDER
Page 14

1   knew that or not.  T.C. informed Officer Weiks that she and her brother were left home alone

2   frequently until 10:00 p.m., and they sometimes put themselves to bed without their parents

3   being home.  A victims's report of abuse, and in this case, neglect, is compelling evidence.

4   *Burke v. County of Alameda,* 586 F.3d 725, 731 (9th Cir. 2009).  Further, Ms. Curow-Ray

5   acknowledged to Officer Weiks that she was a drug addict, and that she had already lost custody

6   of T.C. for two and ½ years prior to this time due to her drug addiction.  Ms. Curow-Ray

7   acknowledged to him that she had used meth a few days before and was "teetering" on the edge

8   of using meth again that day.  She indicated that she used more when under stress.  She told him

9   that she was going to be evicted.  Although she claimed she was going to seek treatment, she was

10  not in treatment for her addiction at that point.  Officer Weiks was aware that Ms. Curow-Ray

11  had decided on Saturday that T.C. should live with Dean Curow for the summer while she got

12  her life back together, but then changed her mind and wanted T.C. back immediately.  Officer

13  Weiks was aware that T.C. did not want to return to her mother's care.  Officer Weiks was

14  present during the conversation between Ms. Curow-Ray and Donna Ray regarding T.R. and

15  knew that they were disagreeing about whether Donna Ray had to bring T.R. to his mother.

16  When faced with a mother who indicates that she is teetering on the verge of using meth, used

17  meth a few days before, has been in a physical fight a few days before with her husband (which

18  involved her daughter), was facing eviction, and was driving, no jury would conclude that

19  Officer Weiks did not have a reasonable belief that the children were "in imminent danger of

20  serious bodily injury."

21       Plaintiffs argue that there is no evidence in the record that the children were physically

22  harmed before.  The undisputed testimony was that the children's parents were using meth daily

23  and that the children were left alone for long periods.  The fact that the children were not hurt

24  before appears to be a matter of luck.  Common sense tells us that the children were at

25  substantial risk of harm.

26       On the question of imminence of harm, an officer must have "reasonable cause to believe

27  that harm will occur in the period of time it would take to procure a warrant and remove the

28

ORDER
Page 15

child from the home" in order to take a child into protective custody without a warrant. *Burke*, at

731-732.  Officer Weiks was aware that Ms. Curow-Ray was being evicted.  It was reasonable

for him to conclude that he would not have a valid address to find the children, particularly if

Ms. Curow-Ray made the decision to use meth again that day, if he waited for a court order.

Officer Weiks had reasonable cause to believe that harm will occur in the period of time it would

take to procure a warrant and remove the children from the home.

Lastly, the scope of the intrusion and degree of Officer Weiks' interference was

reasonably necessary.  *Burke,* at 731.  Officer Weiks did not make any placement decisions.  He

took the children into protective custody and immediately turned the children over to DSHS to

determine appropriate living arrangements for them.  Ms. Curow-Ray testified that it was the

DSHS workers who she felt gave her the choice only of whether she could place the children

into foster care or with her brother, Dean Curow.  Within a very short time after Officer Weiks

placed the children into protective custody, Ms. Curow-Ray signed voluntary placement

agreements for the children.  (The DSHS workers are not defendants here.)  The scope of Officer

Weiks' intrusion and degree of interference was reasonably necessary.

To the extent that Plaintiffs attempt to base their claim on a violation of state law, Officer

Weiks certainly had probable cause to believe that his actions were appropriate under the state

law standard, RCW 26.44.050, which provides:

> A law enforcement officer may take, or cause to be taken, a child into custody
> without a court order if there is probable cause to believe that the child is abused
> or neglected and that the child would be injured or could not be taken into
> custody if it were necessary to first obtain a court order pursuant to RCW
> 13.34.050.

The undisputed evidence is that the children were left alone frequently, and so were neglected.

Under the state statute, then, he either had to have probable cause that the children "would be

injured" or "could not be taken into custody if it were necessary to first obtain a court order."  As

above, the evidence in the record establishes that Officer Weiks had probable cause, that is a

reasonable belief that the children would be injured, in light of the fact that he was aware there

was violence in the home, the only parent not in custody was "teetering" on the verge of using

1   meth, was being evicted, and was driving a car.  He also had probable cause to believe that the

2   children could not be taken into custody if he waited to try and get a court order because he

3   knew that they were being evicted, and had no idea where he might find them if he let them go.

4   Under the circumstances, the Washington state statute also authorized Officer Weiks' decision to

5   take the children into protective custody.

6   a.   *Clearly Established?*

7   Even if Officer Weiks' decision to place the children in protective custody did violate the

8   Plaintiffs' substantive due process right to family unity, that right was not clearly established in

9   the circumstances alleged, and he is entitled to qualified immunity.  The inquiry is whether under

10   the circumstances, a reasonable officer would have had fair notice that the decision was

11   unlawful, and whether any mistake to the contrary would have been unreasonable.  *See*

12   *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003).

13   A reasonable officer would not have fair notice that in these circumstances the decision

14   to take the children into protective custody was unlawful.  Under the Ninth Circuit precedent,

15   children must be in "imminent danger of serious bodily injury," *Wallis*, at 1138, for a police

16   officer to remove them from their parents care without a warrant.  As above, the evidence in the

17   record supports the conclusion that the children here were in "imminent danger of serious bodily

18   injury."  Even if they were not, a mistake to the contrary, made on the side of protecting the

19   children, was reasonable.

20   Furthermore, the undisputed evidence in the record supports Officer Weiks' decision as

21   authorized under RCW 26.44.050.  Officer Weiks was placed in the position, in the middle of all

22   this chaos, to make a decision as to whether to place these children into protective custody on the

23   belief that they were either in "imminent danger of serious bodily injury," *Wallis*, at 1138, under

24   federal law, or to place them into protective custody on the belief that they "would be injured or

25   could not be taken into custody if it were necessary to first obtain a court order," RCW

26   26.44.050, under state law.  It is these sorts of untenable situations in which qualified immunity

27   is warranted.  Qualified immunity should be granted and the claim for violation of the

28

1   substantive due process right to family unity should be dismissed.

2          2.      Federal Constitutional Conspiracy Claim Pursuant to 42 U.S.C. § 1985

3          Plaintiffs' Complaint asserts claims under 42 U.S.C. § 1985(1), (2) and (3).  Dkt. 1.

4   Each claim will be considered in turn.

5          Plaintiffs are not federal officers, so 42 U.S.C. § 1985(1) does not apply.  *Canlis v. San*

6   *Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711, 717 (9th Cir.1981).  Plaintiffs were not parties

7   or witnesses in a federal proceeding at the time, and so 42 U.S.C. § 1985(2) does not apply.

8   *Portman v. County of Santa Clara*, 995 F.2d 898, 909 (9th Cir.1993).

9          Under 42 U.S.C. § 1985(3) - the Ku Klux Klan Act of 1871- individuals are protected

10  from conspiracies to deprive them of their legally protected rights.  *Sever v. Alaska Pulp Corp.*,

11  978 F.2d 1529, 1536 (9th Cir. 1992).  To bring a claim successfully under section 1985(3), a

12  plaintiff must allege and prove four elements:

13          (1) conspiracy, (2) for the purpose of depriving, either directly or indirectly, any
            person or class of persons of the equal protection of the laws, or of equal
14          privileges and immunities under the laws, and (3) an act in furtherance of the
            conspiracy; (4) whereby a person is either injured in his person or property or
15          deprived of any right or privilege of a citizen of the United States.

16  *Id.* (internal citations omitted).  "Further, the second of these four elements requires that in

17  addition to identifying a legally protected right, a plaintiff must demonstrate a deprivation of that

18  right motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory

19  animus behind the conspirators' action."  *Id.*

20         Plaintiffs point to no evidence in the record that Defendants were motivated by racial or

21  other class-based "invidiously discriminatory animus."  To the extent that Plaintiffs bring a

22  conspiracy claim under 42 U.S.C. § 1985(3), it should be dismissed.

23         It is, however, "permissible to state a civil cause of action of conspiracy, based on §

24  1983."  *Cohn v. Norris,* 300 F.2d 24 (9th Cir. 1962).  A civil conspiracy is 1) a combination of

25  two or more persons, 2) who, by some concerted action, intend to accomplish some unlawful

26  objective, 3) for the purpose of harming another, 4) which results in damage.  *Vieux v. East Bay*

27  *Ridge Park Dist.,* 906 F.2d 1330, 1343 (9th Cir. 1990)(internal citations omitted).  "In order to

28

prove a civil conspiracy, the parties, to have conspired, must have reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." *Id.*

To the extent their claim is brought pursuant to section 1983, the Defendants' motion to summarily dismiss Plaintiffs' claim for a civil conspiracy to violate their constitutional rights should be granted. Plaintiffs have failed to point to any evidence in the record which shows that Defendants engaged in a concerted action intended to deny them of their constitutional rights. There is no evidence that the Defendants reached a "unity of purpose." Plaintiffs' federal conspiracy claim should be dismissed.

### E.   STATE LAW CLAIMS

#### 1.   False Arrest and Imprisonment

Under Washington law, false arrest or false imprisonment is the unlawful violation of a person's right of liberty or the restraint of that person without legal authority. *Bender v. City of Seattle*, 99 Wn.2d 582, 590-91 (1983).

> A person is restrained or imprisoned when he is deprived of either liberty of movement or freedom to remain in the place of his lawful choice; and such restraint or imprisonment may be accomplished by physical force alone, or by threat of force, or by conduct reasonably implying that force will be used. One acting under the apparent authority-or color of authority as it is sometimes described-or ostensibly having and claiming to have the authority and powers of a police officer, acts under promise of force in making an arrest and effecting an imprisonment.

*Id.* (*internal citations omitted*).

Plaintiffs' claim for the false arrest and/or false imprisonment should be dismissed. Mr. Ray does not make this claim as to these Defendants. Ms. Curow-Ray failed to point to any evidence in the record which supports her claim for false arrest or imprisonment. Ms. Curow-Ray makes no showing that her right of liberty was restrained by these defendants. Ms. Curow-Ray testified after speaking with her outside the Tumwater DSHS office, the officers told her that she "had to go upstairs [into the DSHS office] and talk to one of the workers." Dkt. 26, at 15. She testified that she "willingly" went. Dkt. 26, at 15. Ms. Curow-Ray states that she was in a locked room at the DSHS office. Dkt. 26, at 20. She testified however, that she did not

1    ask to leave prior to signing the Voluntary Placement Agreements, and was "not leaving that

2    office without her kids." Dkt. 26, at 20.  She makes no showing that she was deprived of her

3    liberty in any manner or was in any manner restrained.  Her claim should be dismissed.

4            Donna Ray argues that when Officer Weiks told her that she had to bring T.R. to the

5    Tumwater DSHS office, her right to remain in the place of her lawful choice was infringed upon.

6    Dkt. 14.  Donna Ray submitted a declaration stating that she felt she had to bring him as a result

7    of Officer Weiks' threat to arrest her if she did not.  Dkt. 16.  She testified, however, that when

8    Officer Weiks told her to bring T.R. to them, she told him "no."  Donna Ray testified that she

9    only agreed to bring T.R. after Ms. Curow-Ray asked her to do so.  Ms. Curow-Ray's testimony

10   is also consistent with this account.  Donna Ray should not be permitted to create an issue of fact

11   by contradicting her own deposition testimony.  *Radobenko v. Automated Equipment Corp.,* 520

12   F.2d 540 (9th Cir. 1975).  Donna Ray stated further that she was never held against her will by a

13   Tumwater police officer.  Dkt. 26, at 51.  Her claim for false arrest and or imprisonment should

14   be dismissed as well.

15                        2.    Outrage

16           In order to maintain a claim for outrage, a plaintiff must show "(1) extreme and

17   outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual

18   result to the plaintiff of severe emotional distress."  *Birklid v. Boeing Co.*, 127 Wash.2d 853, 867

19   (1995)(*internal citations omitted*).  The conduct in question must be "so outrageous in character,

20   and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

21   atrocious, and utterly intolerable in a civilized community."  *Id.*  Although whether conduct is

22   sufficiently outrageous is ordinarily a question for the jury, the trial court must decide as a

23   threshold matter, whether reasonable minds could differ about whether the conduct was so

24   extreme as to result in liability.  *Dicomes v. State*, 113 Wash.2d 612, 630 (1989).

25           Plaintiffs fail to meet the threshold question.  That is reasonable minds could not differ

26   about whether the officers' decision to place the children in protective custody "was so extreme

27   as to result in liability," *Dicomes*, at 630.  It was not.  Plaintiffs fail to point to any evidence from

28

which a jury could conclude that the decision to take the children into protective custody was

conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible

bounds of decency. . . ." *Birklid*, at 867, in the circumstance.  The officers were faced with a

situation in which the children's father was in custody for assaulting their mother.  Their mother,

an acknowledged meth addict, told the officers she was teetering on the verge of using meth

again, had already lost custody of T.C. due to her addiction, and was insisting on getting her

children back immediately.  Donna Ray complains that the officers were rude to her when she

arrived with T.R.  She makes no showing that unpleasantness alone is sufficient under

Washington law to constitute a claim for outrage.  This claim should be dismissed.

### 3. Interference with Family Relations

In Washington, a claim of malicious interference with a family relationship requires

Plaintiff to show five elements:

> 1) an existing family relationship;  2) malicious interference with the relationship
> by a third person; 3) an intention on the part of the third person that such
> malicious interference results in a loss of affection or family association; 4) a
> causal connection between the third parties' conduct and the loss of affection; and
> 5) resulting damages.

*Babcock v. State*,  112 Wash.2d 83, 107-08 (1989) (*internal citations omitted*).

Plaintiffs' claim for interference with family relationships should be dismissed.  Plaintiffs

make no showing as to the second or third element.  There is no showing that the officers here

maliciously acted to interfere with Plaintiffs' relationship with their family.  "Malicious

interference" refers to unjustifiable interference. *Babcock* at 108.  While Officer Weiks placed

the children in temporary protective custody, there is insufficient evidence to prove that such

interference was "unjustifiable."  There is ample evidence that such interference was, in fact,

justifiable.  There is no evidence that the Defendants intended for Plaintiffs to suffer a "loss of

affection." Defendants' motion to summarily dismiss this claim should be granted.

### 4. Negligent Hiring, Retention, Training, and Supervision

In Washington, to establish a prima facie case of negligence, a plaintiff must show a

duty, breach, proximate cause, and a resulting injury. *Hoffer v. State*, 110 Wash.2d 415,421

(1988).

Plaintiffs make claims for negligent hiring, retention, training and supervision against the City of Tumwater.  Dkt. 1.  Plaintiffs' claims should be dismissed.  Plaintiffs do not meaningfully oppose the motion regarding their negligent hiring, retention, and training claims.

Plaintiffs argue that, as to their negligent supervision claim, the officers did not follow RCW 26.44.050 or the constitution when they decided to place the children in temporary protective custody.  Dkt. 14, at 12.  RCW 26.44.050 provides:

> A law enforcement officer may take, or cause to be taken, a child into custody without a court order if there is probable cause to believe that the child is abused or neglected and that the child would be injured or could not be taken into custody if it were necessary to first obtain a court order pursuant to RCW 13.34.050.

Plaintiffs argue that if they had been properly supervised, Tumwater would have realized that the officers were exceeding their authority.  Dkt. 14, at 12.  Plaintiff's position is without merit.  Plaintiff makes no showing that the officers here "were acting outside the scope of employment," *Niece v. Elmview Group Home,* 131 Wash.2d 39, 48 (1997) when they decided to take the children into protective custody.  Plaintiffs do not provide any evidence on the standard of care for the supervision of police officers.  *Gurno v. Town of LaConner*, 65 Wash.App. 218, 228-29 (1992).  Plaintiff provided no evidence that there was a breach of any standards.  Plaintiff made no showing that a breach of a standard of care proximately caused their alleged false arrest, interference with family relationships, or any other injury.  Defendants' motion to summarily dismiss Plaintiff's claims for negligent hiring, retention, training, and supervision should be granted.

## III.   ORDER

Therefore, it is hereby, **ORDERED** that:

• Defendants' Motion for Summary Judgment (originally Dkt. 10, refiled as Dkt. 22) is **GRANTED**;

• Plaintiffs' claims against all Defendants are **DISMISSED;**

• This case is **DISMISSED**.

1    The Clerk of the Court is instructed to send uncertified copies of this Order to all counsel

2    of record and to any party appearing *pro se* at said party's last known address.

3

4    DATED this 12th day of August, 2010.

5

6    _____
     Robert J Bryan
7    United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER
Page 23